Apologize for being a few minutes late. We had trouble with our bill at lunch. We had plenty of time and then all of a sudden at the end we got caught up. It wasn't because of bad credit though. We won't make bad credit. This is case number 4-12-1076, Kristen Dohse v. Clifford Lee Gunter. Excuse me, Ekhaese. I'm sorry, I just missed the line there. Attorney Gunter is here on behalf of the appellant. My name is Lee Gunter and I represent the plaintiff appellant Kristen Dohse. We're appealing the order entered on the jury's verdict in denial of our post-trial motion. Our brief has raised a number of issues. In argument, I would like to address a number of these issues, including the answer to the jury's question and the introduction of alcohol into the case. As to any issues not discussed, we would certainly stand on our brief. I think a little background is necessary. Very early on Sunday morning, April 15, 2007, a little bit after midnight, Kristen Dohse goes to the emergency room at Sarah Bush Lincoln Health Center in Charleston, complaining of the worst abdominal pain she's ever had. She's getting shocky and she has x-rays done of the abdomen to show that there is free air in the abdomen. I think everybody agreed that the free air shouldn't be there and that shows that somewhere in a hollow organ there's a hole that is allowing the air to escape, most likely the digestive tract. Defendant Dr. Casey is summoned to Sarah Bush to take her to emergency surgery. I think everybody has set forth in our brief agreed that she needed emergency surgery. The condition of the hole in her hollow organ was life-threatening. So he took her to surgery, opened her up with an incision that started three centimeters below her belly button, down almost to her pubic bone, just a little bit above her pubic bone. Removed her appendix, which he described as not overly inflamed, and then closed and sent her up to a post-surgical floor. The next morning, he ordered a CT scan of the abdomen with intravenous contrast. And he was looking for the contrast material to come through a hole in her stomach if one was there. And, of course, it didn't because intravenous contrast has no way of finding that hole. It should have been a test with oral contrast, according to our experts. If he wanted to see the contrast come out of the hole, she had to swallow it. He then continues to monitor, and he's trying to treat her medically. By post-op day three, he gets a consultation from Dr. Malik, who's an OB-GYN. And Dr. Malik doesn't see anything there. He recommends that she maybe have some other procedures done, including an EGD. The next day, which is Thursday now, April 19, post-op day four, Kristen has a gastroesophageal duodenoscopy. He puts a tube down in her throat and looks around. As he's withdrawing it, he sees a crater. There's a hole in her stomach. He then takes her to surgery. He can't find the hole. He calls in Dr. Green, and then, again, he finds the hole on the inside with the EGD tube. Dr. Green opens up what's called the lesser sac, and I'll get to that in a minute. They find the hole, repair it. By now, she's septic. She's got abscesses going. She comes out with, this was somewhat disputed, but she had breathing difficulties. So she spent a couple days on a ventilator. The abscesses, the adhesions that she had, she ended up, instead of what should have been about a three- to five-day hospital stay, she ended up a month in the hospital, having been transferred to Provena and then the University of Chicago. And she had a long period after that where she was still getting intravenous antibiotics. There are pictures in the exhibit. They only found the hole by using, or by the endoscopy. Yes. And our position- Is it in the record that, for example, when there's air in the abdomen, the hole can't be discovered? Or is it a common practice then to do an endoscopy to see if the hole can be found? I mean, if that's not in the record, you don't have to respond. Well, I'm not sure how much the record says it's a common procedure. It is a procedure that can be used. Our expert testified that what Dr. Akazi should have done on the morning of April 15th was look at the entire abdomen. If he had to do an incision from pubic bone to xiphoid process, that is what he should have done so he could visualize everything. Dr. Akazi testified that he did a very thorough examination, including the front of the stomach. There's kind of an apron of cellophane-like tissue that goes over the front of the stomach. You have to cut through that to get to the back of the sac. Parts of that area are very vascularized, and the concern was you cut through there, you might damage the spleen. At least that's what the testimony was from the defendant. Dr. Pruitt, our expert, said that he should have gone through the lesser sac, looked at the back of the stomach. Had he opened up the back of the stomach, he would have seen all kinds of gunk, for lack of a better word, turbid fluid that was back there from the hole, and inspecting the back of the stomach would have revealed the hole. And he should have done this in the first surgery, and that would have been that. Dr. Akazi said that, and his expert said that, gee, that was risky, because you might cut into some of the blood vessels that are there, and it could damage the spleen. On cross, I asked Dr. Shapiro, who is the defendant's surgical expert, how many times he had gone through the lesser sac. He said thousands. I asked him how many times his patients had lost their spleen. He said none. I asked Dr. Pruitt, who is the younger surgeon, how many times he had been through the lesser sac. He said he wasn't sure. Seventy-five to one. And of those patients, how many of them have lost their spleen? The answer was none. And Dr. Green went through Kristen Dosey's lesser sac, and she didn't lose her spleen. So, you know, they said that he should have, you know, it was prudent not to go through the lesser sac and find that hole, when, in fact, not going through the lesser sac, darn near killed her. Dr. Akazi also said that there was another way to go through. You can go under the stomach, where it's not as vascularized, and flip it over that way, and there's not much risk there. He admitted there's not much risk there. But rather than completing the surgery from his very low midline incision, he simply closed and monitored, which is why he ordered the CT, the wrong CT. I assume these arguments were made to the jury. Yes, they were. Well, there's two expert, competing expert viewpoints. You have a jury verdict. You know there's a standard of review. Yes. How do you overcome that? The jury, and the first issue I want to address is the trial court's response to the jury's question. And it was on IPI 20.01. And yes, I agree that it is pursuant to Van Winkle v. Owens Corning, it is an abuse of discretion standard. IPI 20.01 is the issue's instruction. Plaintiff claims that she was injured and sustained damage, and the defendant was professionally negligent in one or more of the following ways, and there are four that were listed. Failing to find a perforated stomach at the time of the April 15, 2007, surgery. Failing to order tests to timely and properly diagnose plaintiff's stomach perforation. Failing to properly treat plaintiff's perforated stomach by closing seams surgically. And failing to prevent formation of blood clots. And the jury's question was, do these points all refer to the April 15th date? The first one specifically says April 15, 2007. The other three don't have a date attached. Who prepared that version for us? The jury's instruction, I did. Instruction, excuse me. Yes, that was my instruction. Okay. In their brief, the defense concedes that two of them, at least, referred to something post-April 15. Dr. Pruitt included criticisms of Dr. Hayes that the defendant on April 16 improperly ordered the CT scan and the IV contrast. In discussion by Dr. Zahr, Dr. Hayes' alleged failure to prevent blood clots concerned the failure to give anticoagulant medications over a period of several days. So the defense has conceded that two and four did refer to something other than April 15. Number three, failing to properly treat plaintiff's perforated stomach by closing seams surgically. I would also argue that Dr. Pruitt addressed that. He was asked on cross, specifically, well, wasn't it reasonable for Dr. Ekesi to order the CT scan the next day looking for the hole? Dr. Pruitt said, no. She was a surgical candidate. She should have taken her surgery. Yes, but, doctor, she's not in surgery now. Wouldn't it be reasonable to order the CT? No. She's a surgical candidate. She needs to go to surgery. And that was specifically relating to the 16th, not the 15th. The court kind of agonized over this a little bit. And at one point, it's in the record, volume six, page 1193. The judge said, it's always difficult to try to surmise what the jurors are thinking when they ask a question of this type. You don't want to leave them with more questions based upon the manner in which I respond to this. So my concern is if I say, please refer to your collective memories with regard to the testimony you've heard, I'm kind of avoiding the question, which brings us to the couple of cases, People v. Childs, which was a criminal case by the Illinois Supreme Court. And the rationale there that a juror is entitled to have his questions answered was specifically addressed by the Fourth District in Van Winkle v. Owen Corning. People v. Childs, the Illinois Supreme Court said that jurors are entitled to have their inquiries answered. The general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or request a clarification on a point of law arising from facts about which there is doubt or confusion. This is true even though the jury was properly instructed originally. And we're making no claim that they weren't properly instructed, at least as far as this point. When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy. If the question asked by the jury is unclear, it is the court's duty to seek clarification of it. Therefore, the failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error. In the case of Forrest, the jury posed an explicit question which manifested juror confusion on a substantive legal issue. And with that, the Illinois Supreme Court reversed the conviction in Childs. They also said whether the instructions were proper and were agreed to by defense counsel is not the determinant of inquiry. The issue is whether the instructions were clearly understandable to the jury. Apparently, they were not, or the jury would have asked the question, wouldn't have asked the question if asked. A jury is entitled to have its explicit legal questions answered. Then in Van Owens, or I'm sorry, keep doing that because it's Owens Corning, Van Winkle versus Owens Corning. They quote the court as a quote, as a court in Childs wrote, whether the instructions were proper is not the determinant of inquiry. The issue is whether the instructions were clearly understandable to the jury. The jury's question here involved a substantive legal issue, namely the elements of a civil conspiracy. Here, it's the elements of the allegation for medical negligence. We hold that the trial court abused its discretion in its response to the jury's written question, which was in effect no response at all. It basically said you have heard the evidence and been instructed on the law to continue your deliberations. The court held that that was not proper. Indeed, in the midst of jury deliberations after a vigorously contested trial, and I would note that this was a vigorously contested trial, a question from the jury deserves as much, if not more, thoughtful consideration as did the original instructions. Accordingly, we hold that when jurors raise a question during deliberations, counsel must submit in writing. The specific response counsel wants the court to give the jury. Accordingly, because the jury's question here constituted an explicit question, which manifested juror confusion on a substantive legal issue, we hold the trial court abused its discretion in the response to the jury's written question, which was no response at all. What I had submitted in writing to the court was in answer to the question, do these points all refer to the April 15th date, was no. The opinions rendered in court by expert witnesses address these issues. So it points them back to some testimony, but it gives them the explicit answer to the explicit question, do these all refer? No. The court gave the answer submitted by the defense, which was to answer your question, please refer to your collective memories of the opinion testimony from qualified witnesses who spoke to these issues. Review the evidence. They weren't asking what the evidence was. They were asking what is the law in this instruction. And starting out with IPI 101, they're told three times there that the law is contained in these instructions and that you must follow the law that is in these instructions. So they ask what's in the instruction, and he refers them to opinion witnesses. I would submit that that is the same non-answer that was given in Van Winkle v. Owens Corning. They heard all the evidence, including the opinions of the experts. They heard argument. And at one point in argument, I was saying she was a surgical candidate when she came in on Sunday. You should have taken her to surgery on Monday. You should have taken her to surgery on Tuesday. You should have taken her to surgery on Wednesday. And then you finally did take her to surgery on Thursday. They had heard all that. The question was, the law, does it refer only to April 15th? And they got a non-answer to that. The appropriate answer was simply no. And it is based on that, that the judge did not give an answer to that explicit question on a matter of law, that we think we were denied a fair trial, that the failure to answer that question was unfairly and severely prejudicial, and that the plaintiff is entitled to no trial on that basis. The next issue that I wanted to address was regarding the injection of alcohol into this case. There was no testimony by anyone that, I'm sorry, let me back up. Her initial history was that she had been in a Greek event at Eastern Illinois University, denied having anything to drink besides water. On post-op day three, when she was seen by the consultant, Dr. Malik, he wrote that she had been at a frat party, had a couple of beers. No one at any point said that the consumption of alcohol, if it had in fact taken place, and we disputed that, caused or contributed to cause her physical condition. Therefore, it wasn't relevant. With a Supplemental 213 disclosure, the defense disclosed that had Kristen Dozie admitted to the surgeon, to her surgeon, that she had a few beers, he would have focused on her stomach. So I filed a motion to bar alcohol as irrelevant. The judge denied that motion based on the fact that the disclosure said that a surgeon who knew this would focus more on the stomach. Counsel, you didn't object to the evidence when it came in during the trial, though, is that correct? That is correct. As a matter of fact, I tried to front it. I called a witness who said it was verified that she had been at this non-alcoholic Greek function at Eastern as opposed to at a frat party. This witness also said she hadn't drunk anything. And it was because it was my understanding and belief, and I'm confident this was the trial judge's belief, that they would at some point tie this up. That Dr. Casey was going to take the stand and say, I would have focused on her stomach if she had done that. Instead, Dr. Casey takes the stand with his expert support that he did a very thorough examination of her entire abdominal contents. He palpated the stomach, he looked at it, found no signs that were related to a hole in particular. So basically, the strategy was he did a thorough examination, and then rather than look at the back of her stomach, he prudently stopped the procedure and set her up to recover and then decided to medically manage her. If he was going to medically manage her after having done a thorough examination of her stomach, what more focus could he have placed on her stomach? He never said, Dr. Casey himself never said, what the knowledge of her having had a few beers, how that would have affected his procedure. Dr. Shapiro, their surgical expert, never said how knowledge of her having had a couple of beers would have affected this procedure. Defense never tied this up. They threw it out there, the judge let it in, and then during the course of the trial, I don't know if you had a chance to look at it in our brief, Defense counsel did what I thought was a very effective destructive cross on my client based more on her drinking. It wasn't about the doctor's focus. It was about dirtying up the plant, and that is how it appears from the get-go that the disclosure said would focus more. It never said that had he known this, he would have gone through the list of facts, looked it over, and looked. It never said anything like that. It just said he would have focused more. But Dr. Casey did not say, I would have focused more. So what we have then is what we believe is very prejudicial cross-examination of the plaintiff when it was not in any way relevant to any issue in this case. Now, yes, I did not object. I tried to front it. I tried to deal with the trial. And in closing, I said, if you look at the record, every doctor said they kind of reviewed what went before, and it started with she had been at a Greek function. By the time it got to Dr. Malik, she had been at a frat party and had a few beers. And this is kind of like the kid's name at telephone where you tell something to somebody else and it just goes around in a circle. So I admit, I tried to deal with what I believed was a legitimate purpose for allowing it in, as I think the trial judge did. And even in the post-trial motion, the trial judge said, based upon the unique circumstances of this case and the defendant's contention that the doctor had been, that had the doctor been made aware of the possibility of alcohol assumption, that they may have perhaps conducted a different type of examination. Yeah, but they never did that. They never brought that in. They never tied it up. The sole purpose of talking about alcohol was to give them a chance to do the destructive cross and thereby dirty up the plaintiff, which was unfair and extremely prejudicial. And we have in the, we cited in our brief to a number of cases which note that the waiver rule, since I didn't object to trial, is a limitation on the parties to an appeal, not on the reviewing court. Then we also cited Dillon v. Evanston Hospital. The waiver rule is a principle of administrative convenience and admonition to the parties. It is not a jurisdictional requirement or any limitation upon the jurisdiction of a reviewing court. A reviewing court may, in furtherance of its responsibility to provide a just result, override considerations of waiver. We deem that this responsibility outweighs waiver. Then Hansel v. CTA, it is error for counsel to indulge in assertions which appeal to the passions of the jury and have no bearing or relation to the case whatsoever. And I would argue that that is exactly what happened here. Now, counsel, you did present evidence that your client didn't consume any alcohol that night. You had a witness to that effect. Is that correct? Yes. And you also presented the report of Dr. Malik that mentioned the beer consumption. Is that correct? Yes, I did. So this isn't a situation where you made a strategy decision and you're now regretting that, is it? No, because I believed, and I think the trial judge still believes, that there was a legitimate purpose to this. It was brilliantly done. I never had a clue that they were never going to tie it up. I thought they had. They asked Dr. Shapiro what would he do. And he said, what about if a surgeon who knew this said, well, I do this. Nobody ever said Dr. Ekesi would have in any way changed his procedure. In fact, the defense was everything he did was proper. So what I'm saying is I never saw it coming, didn't see it until I was reading the record, and I realized that nobody had ever tied this up. And then if you look at the destructive cross, I quoted it extensively in our brief, if you look at the destructive cross, I think the purpose for bringing in the alcohol is readily apparent. And it is on that basis, and then, of course, the other bases that we cite, including the answer to the court's question. Does that mean I have a minute to go? No, that means you're out of time. Oh, I'm out of time. I'm sorry. For everything else, I stand on arbitration. Thank you, counsel. Mr. Miller. Good afternoon to you all. Good afternoon. I'm Kevin Miller, and I represent the Appleese, Sarah Bush Lincoln Health Center, a hospital in Mattoon, Illinois, and Obonoruma Ekesi, the surgeon that they used to employ. He's no longer with them now. He's down in Texas. But those two Appleese I represent. Dr. Ekesi has explained to me  if we use the three letters of the alphabet, he'll say, E-K-Z. We'll be pretty close. I've heard it said sometimes that often in life we get more with less. There's a lot of material here, but I think I can probably give you more of my viewpoint if I use less of my time and just speak to a few of the points that are raised in the brief. I'd like to do that. Forgive me if I don't use all of my 20 minutes in doing this. But let me address a few questions Justice Turner asked, the first one, and that is, is there something in the record that deals with whether an EGD should be done if you suspect a perforated stomach? Your Honor, I believe you will find it in the record when Dr. Ekesi was under adverse examination speaking about the fourth postoperative day when he did the EGD. He says it's actually contraindicated. The stomach has bacteria in it. If you have a hole in the stomach, the last thing that a surgeon wants to do is fill that stomach with air, which would then push through the hole and into the abdomen. So no, the short answer is it's not done unless you are reasonably beyond that initial suspicion of a hole being there. The jury's question was discussed a little bit by counsel for the plaintiff, and I think it is on page 36 that you'll see the two responses that were proposed to Judge O'Brien to answer the jury's question. I made a mistake, it's not 36. It might be 26. But Judge O'Brien was in a little bit of a pickle. He had a question from the jury. I think he handled it exactly appropriately. He summoned the lawyers. He asked them what they thought of it. He let us discuss things back and forth, and then he finally said, here's the question, put it in writing. Mr. Gunter, if you want to say a simple no, that's okay. But go ahead and give me your final response. The two proposed responses are quite similar. The plaintiff on the one hand says, no, the opinions rendered in court by the expert witnesses address these issues. In other words, the plaintiff's response said, look at the expert testimony. The defendant's response said, to answer your question, please refer to your collective memories of the opinion testimony from qualified witnesses who spoke to these issues. Almost identical responses, with just one difference, and that is the plaintiff used the word no. That's pretty big, though, isn't it? I don't think so, Your Honor, because no or yes would have been inappropriate. Either way you do that. There were four allegations of negligence the jury was asking about. They were asking, do these all refer to the same date? Well, the first and the third did. The second and the fourth didn't. So if you answer no, you get it wrong on the first and the third. And if you answer yes, you get it wrong on the second and fourth. And that's why I say Judge O'Brien was really in a pretty difficult situation. I think he also recognized, at least we argued to him, that it was the plaintiff who offered this instruction. We felt that there were no insufficient evidence to support the allegations two, three, and four of negligence, and that it really should have just been one. Negligence in failing to find the hole in surgery. That would have cleared up the whole issue. We didn't create the issue, but I think we did give the judge a good response that he then gave the jury when it was appropriate. I mean, it is not an incorrect statement to say the opinion witnesses provided you that answer. He was right about that. It was not inappropriate to let everyone give us, each party give him their best effort in answering the question. And it would have been inappropriate to say either yes or to say no to the question in its entirety. So he did what he did, and I appreciated it very much that he didn't overemphasize one expert's testimony against the other. He could have, for example, said, well, Dr. Pruitt claimed that this happened on this date and on this date in the plaintiff's case. I would have taken offense at that. I would have felt my client was prejudiced by that answer. He didn't do it. He was hands off by that. The second issue that was raised just a moment ago, the alcohol issue. And I'd like to address that if I could. I haven't seen a better case of waiver. I couldn't imagine a better case of forfeiture of this issue. And I don't want to diminish that, but I do want to look at how alcohol played out in this case. But first of all, there was a motion in Lemonet which said, and I think I can almost quote it exactly, because alcohol didn't cause the injury, the hole in the stomach, it's irrelevant. That's all it said. The plaintiff's attorney declined to argue that. We said it's not a causation issue. Judge O'Brien, we said it's a standard of care issue. It goes to the standard of care. If you tell us that you're drinking, you're a college student coming from a Greek party, the biggest party of the year at Eastern Illinois University, and you're drinking alcohol when you feel the problem in your belly, the surgeon knows to look at the stomach. It's the presentation of the patient which dictates the surgeon's response. And in that context, we were going to offer it. There was no reply. Of course, Judge O'Brien denied that motion in Lemonet to exclude it. The plaintiff wanted to exclude it on causation. We said it's not an issue on causation. No other argument. And then, of course, as you pointed out, Justice Holder-White, the plaintiff introduced it through exhibits, through testimony, through cross-examination, did not renew the objection as he's required to do, and it did become an issue then in the case. Here's where Mr. Gunter is wrong this afternoon. On page 38, we've quoted exactly where we tied it up. It was in the testimony of Dr. Shapiro, our surgery expert, who said this, if a college kid, and he said, I know I haven't been on college campuses myself in years, but I teach on a college campus. I haven't been a student for years, he said. But when the students come and they tell us these things, we pay good attention to that. If you tell a doctor that I have pain and he says where and I don't tell him, he'll have to look all over head to toe. If I tell him it's my elbow, that's where he'll look. Similarly, surgeons, and I don't know if it's profiling. Is that what we call it? I don't know. My mind is fascinated by the case this summer from down in Florida on the profiling issue. But I'm glad that the surgeons do what they do. I have three daughters in college right now, and if they come to the emergency room, I want them to tell the doctor what's going on, what they've been doing, so he can focus his attention properly. And when a college kid, these surgeons know it, when a college kid comes after a party at 2 o'clock in the morning on a Sunday saying, as I was drinking beer I started feeling something in my belly, the surgeon knows maybe she took something, maybe she was giving something when she wasn't looking, maybe something happened, but we're going to check the belly first. We're going to check the stomach first. That's the first organ that what we ingest hits. That's where he goes. And that's how we tied it up. I didn't think we made a big deal of it with Dr. Shapiro, an overly big deal of it. Normally the alcohol issue comes in on proximate cause. You've got an operator of a machine, a motor vehicle. You've got someone walking and he trips and falls or there's an accident. The defense usually wants to say, that was the cause of your accident. You were drinking. And, of course, we know there has to be a level of intoxication to do that. Granted, this wasn't a proximate cause issue that came in. So why cross-examine her about it? Because of the inconsistent statement. To what end? To what end? There's a hole in her stomach, Your Honor. She says she was drinking water. Probably not. Water doesn't put a hole in our stomach. Her medical records eventually say otherwise. She came from a party. We are saying, in response to the plaintiff's theory that the clinical picture dictates the surgeon's response, was this the clinical picture or not? In other words, she's saying that my surgeon should have inspected the stomach much more thoroughly. Okay. Well, we would have if, in fact, you had told us this presentation from the get-go. And that's where it came from. I hope I've satisfied your question. I don't know if there's a perplexed look on your face still or not. That's my usual look. Perplexed. Okay. Finally, could I just point out one thing, and that is with the manifest weight of the evidence question, yes, my client was impeached. Just as you pointed out, Ms. Dozie was impeached on a prior inconsistent statement. But the remedy for an inconsistent statement is not a JNOB. It's impeachment, I tried. That was done. The jury considered these issues, looked at it, and made their decision. We ask that you deny this request for a judgment notwithstanding the verdict or new trial engagements. Thank you very much. Thank you, counsel. Mr. Gunther and then Buttle. Yes, Your Honor. Thank you. Let me start backwards with the alcohol issue. I still didn't hear how this would have in any way affected Dr. Casey's treatment. Focused on the stomach. What does that mean? He decided not to look at the back of her stomach because he thought it was too dangerous. That was his testimony. So what does it mean that he would have focused on her stomach? He said he examined it. He never said that had he known that she'd been drinking, he would have done something different. No one ever said, had he known she'd been drinking, that he would have done something different. They never tied it up. Simply saying that, as Dr. Shapiro did, well, that would change my focus. And that's essentially what he says on page 38 of the appellee's brief. It would have changed my focus. How? It is never tied up in this case. And yet, as I put in there on page 45, 46 of the appellant's brief, he did a pretty darn brutal cross at my client. And based on the alcohol issue, it shouldn't have been there. I did not catch that it would never be tied up, never actually be relevant to any issue in this case. The trial judge, as mentioned, didn't catch that it was not tied up, would never be relevant to any issue in this case. So we are still, obviously, claiming error on that part. And again, maybe a classic case for waiver. But what I waived had nothing to do with the fact that they would never be able to tie it up. Didn't know that. I wasn't supposed to know that. I wasn't supposed to figure that out. Didn't recognize that until I read the entire record. And based on his ruling and oral arguments on the post-trial motion, the trial judge never recognized that. He wasn't supposed to either. Regarding the question, the answer was no. If 1 and 2 refer to April 15th, then the question, do all of these apply? No. You have two that don't. Maybe 1, 2, and 4. Or 1, 2, and 3. As long as there is one that did not focus on April 15th, the answer to that question was no. As your Honor mentioned, that's a huge, huge word. And we put the argument in there, and you have it in the transcript. I started with no. I started with something else. I wanted an explicit statement to the jury. No, this was not intended to be restricted to that one date. But I put no, hopefully, to get something more in. I added the part, because the judge seemed to be leaning that way, about you've heard the testimony from the experts. Yeah, that tells them the facts. But the law, they had to understand the law and then look at the facts. And they never understood the law in this case. The judge, it was an explicit question, which manifested juror confusion on a substantive legal issue. And it was not addressed by the court. He gave them a non-answer. You heard testimony. That doesn't tell them what that instruction means. And he'd been all day reading the instructions, telling them, this is the law. You can't rely on just one and not the other. You've got to take them as a group. You must apply the facts to the law. And they haven't done what the law is when they ask. If he wasn't clear on how to answer, according to Van Winkle, he was supposed to ask. But regardless, he didn't answer that question. It was unfair. Put it in with the alcohol. The alcohol was inflammatory. It's recognized in life in an appellate decision about how inflammatory the injection of alcohol is into a case. Highly, unfairly prejudicial. And I think just those two combined, and as a matter of fact, either one of them singularly, should require a new trial on all issues. There were some other things that we went through extensively. And I guess it didn't come up that we relied on our police for those. Thank you, Mr. Frenter. We'll take this matter under advisement and be in recess until the next case.